UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

BLAKE TALLANT,                          )
                                        )
              Petitioner,               )
                                        )
v.                                      )      No.:   3:15-CV-459-TAV-HBG
                                        )
GRADY PERRY, Warden,                    )
                                        )
              Respondent.               )

## MEMORANDUM OPINION AND ORDER

Petitioner Blake Tallant ("Tallant"), a Tennessee inmate proceeding pro se, has filed

a federal habeas petition under 28 U.S.C. § 2254, which attempts to challenge a 2006

judgment imposed against him by the Knox County Criminal Court. Having considered

the submissions of the parties, the state-court record, and the law applicable to Tallant's

claims, the Court finds that the petition should be denied.

## I.      SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

In November 2002, Blake Tallant and his wife, Sarah Tallant ("Sarah"), were

charged in a multi-count indictment with first-degree felony murder and aggravated child

abuse for the August 2002 death of their three-and-a-half-month-old son, Lex Arson

Tallant ("Lex") [Doc. 27-1 pp. 12-14; Doc. 27-8 p. 54]. Sarah cooperated with the state,

entering a plea agreement and offering testimony against Tallant at his trial in exchange

for a twenty-year sentence with an eligibility release date of thirty percent [Doc. 27-8 pp.

54-56].

Tallant stood trial on the charges in April 2006 [Doc. #27-7]. The Tennessee Court of Criminal Appeals summarized the pertinent facts of this case as follows:

At trial, Officer Krista Sheppard with the Knoxville Police Department testified that on August 14, 2002, she responded to a call to go to a residence located on Knott Avenue in Knoxville. Officer Sheppard testified that prior to arriving at the residence, she was told that the call concerned a child who was not breathing. She arrived at the residence at 10:40 p.m. to discover a woman, later identified as Sarah Tallant, screaming about her baby. Ms. Tallant pointed Officer Sheppard to the dining room, where she discovered an infant lying on a table. Officer Sheppard said that the infant, the three-month-old victim in this case, Lex Arson Tallant, appeared "bluish in the lips and grayish colored." Her husband, the child's father, who is also the defendant in this case, stood over the victim.

Shortly after Officer Sheppard discovered the victim, a firefighter arrived, and she and the firefighter gave the victim CPR until paramedics arrived. When she began CPR, Officer Sheppard noticed abrasions on the victim's chin. She asked the victim's parents about the abrasions, to which both parents replied the child was suffering from a rash. After the paramedics began working on the victim, Officer Sheppard spoke with both parents. Ms. Tallant said that she had taken the family's two pit bulls for a walk at a local park around 7:30 that evening and returned at 8:15. Upon returning home, Ms. Tallant noticed the victim lying on the defendant's chest in the bedroom she shared with the defendant. After washing her face, she returned to the bedroom, where she told the defendant that the baby did not appear to be breathing. The defendant replied that he had fed the child earlier in the day, but that the child had only eaten a small amount of food, and that he had spit up some brown substance.

Officer Sheppard asked Ms. Tallant about the victim's medical history. Ms. Tallant replied that the baby had a rash, and the defendant said that once while the family was in Sweetwater, someone had gotten in front of the baby and scared him, causing him to stop breathing. Ms. Tallant elaborated on this incident, stating that while she was changing his diaper, it appeared that the victim had stopped breathing, and she called for her husband to look at the baby. Ms. Tallant said her husband blew into the baby's mouth, and he started breathing again. Ms. Tallant said that she and the defendant did not take their son to the hospital after this incident.

2

Officer Sheppard recalled that during the questioning, Ms. Tallant seemed "really nervous, kind of like she was just concerned about her child, panicking that her child was not breathing, and she wanted someone to help them." The defendant, on the other hand, acted "spacey." The defendant's demeanor "was very slow and just like nonchalant .... like he was not there." After a while, the ambulance took the victim and Ms. Tallant to the hospital. According to Officer Sheppard, when the defendant later learned via telephone that his son had died, the defendant said "Oh, my God" and did not cry or show any emotion.

Kenneth Slagle testified that in August 2002, he was employed as a detective with the Knoxville Police Department when he responded to a call at the Tallant residence. By the time he arrived at the house, the ambulance carrying the victim and Ms. Tallant had already left, so Detective Slagle interviewed the defendant. The defendant told Detective Slagle that he had walked around carrying the baby for six hours. Detective Slagle testified that the defendant was not making much sense while he was speaking, and although the defendant denied being under the influence of drugs or alcohol, Detective Slagle did not believe him. Detective Slagle asked the defendant if he was willing to take a test to prove that he had not been recently using drugs, and the defendant replied that he would take the test. Detective Slagle testified that Officer Rickman with the Knoxville Police Department then arrived and informed the defendant that he would be taking him to the hospital. Officer Rickman then searched the defendant, finding a small package which the defendant admitted contained methamphetamine. On cross-examination, Detective Slagle admitted that in his written report detailing the investigation, he did not indicate that the defendant had carried the victim in his arms for six hours. Officer Slagle also did not recall Ms. Tallant telling him that the defendant had dropped the victim.

Officer Norman Rickman with the Knoxville Police Department testified that he was also called to the Tallant house the night the victim died. Upon his arrival, Officer Rickman told the defendant that he would be transporting him to East Tennessee Children's Hospital. He then asked the defendant if he had anything in his pockets and if the defendant cared whether he (Officer Rickman) looked in his pockets to make sure he did not have any weapons on his person. Officer Rickman testified that the defendant did not object to being searched. Officer Rickman searched the defendant, and upon doing so he located a small bag of what the defendant admitted was methamphetamine. On cross-examination, Officer Rickman admitted that when he initially arrived at the residence, he intended to transport the

defendant to Children's Hospital to be with his wife and son. Shortly after Officer Rickman found the drugs on the defendant, he was notified that he was to take the defendant to the University of Tennessee Medical Center for blood testing. When asked whether the defendant was free to leave his house before he was searched, Officer Rickman said that he had no knowledge whether the defendant was free to leave. Officer Rickman also stated that while it was possible that the defendant was notified about his son's death before he was transported to the hospital, he (Officer Rickman) did not know about the child's death before he transported the defendant.

Thomas Hitefield stated that in August 2002, he was employed as a Sergeant with the Knoxville Police Department. He also responded to the Tallant house the evening the victim died and interviewed the defendant. The defendant told Sergeant Hitefield that he had held the victim tight, wrapped up so that he couldn't move, when he noticed that the victim was gurgling, with "brown stuff" coming out of his mouth. Sergeant Hitefield said that the defendant's demeanor during this time was "distant ... he didn't show any emotion at all." Sergeant Hitefield testified that he was present when the defendant received a phone call informing him that his son had died. Sergeant Hitefield said that upon receiving this call, the defendant cried for a few seconds but then showed no other emotion.

Three agents with the Tennessee Bureau of Investigation (TBI) testified regarding evidence gathered in connection with this case. Agent Jeff Crews testified that a sample of the victim's blood tested positive for methamphetamine. Agent Michael Lyttle testified that the defendant's blood sample tested positive for methamphetamine and his urine sample tested positive for marijuana. Agent Celeste White testified that the substance taken from the defendant the night of his arrest was in fact methamphetamine.

Dr. Murray Marks, a forensic anthropologist with the University of Tennessee, testified that he examined both x-rays of the victim and bones from the victim's body to evaluate bone trauma suffered by the victim. Dr. Marks testified that his investigation revealed that the victim suffered nine antemortem fractures of his left-side ribs and nine antemortem fractures of his right-side ribs. Dr. Marks explained that antemortem fractures were those that featured bone calluses, which meant that the bone had healed and the fracture occurred prior to death. Dr. Marks said that the victim also suffered two perimortem fractures of his right-side ribs and three perimortem fractures of his left-side ribs, which included one rib being broken in two places. Dr. Marks explained that perimortem fractures were those that were

"fresh" and had no signs of healing. Dr. Marks also noted that the victim suffered an antemortem fracture of his femur, or thigh bone. Dr. Marks noted that this break had a particularly large callus, which indicated that the bone "was broken and was never set." Dr. Marks also testified that the victim suffered an antemortem fracture of his right humerus, his upper arm bone.

On cross-examination, Dr. Marks testified that the bones of a child the victim's age tended to heal more quickly than those of an adult, which led him to conclude that the perimortem fractures occurred anywhere between the child's death and ten to fourteen days of his death. Dr. Marks said that he could not testify as to whether the victim's broken leg was a spiral fracture, and he also said that he had never heard of an instance where massaging a child's leg could lead to a spiral fracture. On redirect, Dr. Marks testified that although he stated that the victim's perimortem fractures could have occurred up to two weeks before his death, it was unlikely that the breaks were that old because the bones of a child the victim's age tended to heal quickly. Thus, the perimortem fractures were likely no more than ten days old.

. . . .

[Sarah] Tallant testified that she met the defendant in 1995 and married him in 1997. The couple originally lived in Arkansas before moving to Tennessee in March 1999. Ms. Tallant testified that she began using methamphetamine when she was eighteen and used the drug daily until she moved to Tennessee. She also said that the defendant used drugs daily during the early part of their relationship and marriage. She testified that she and her husband moved to Tennessee in an attempt to create a "fresh start" and escape from the drugs. She testified that both she and her husband stayed off methamphetamine until their first son was born in June 2000. Shortly after their first son was born, both the defendant and Ms. Tallant resumed using methamphetamine on a daily basis. Ms. Tallant testified that the couple's daily methamphetamine use continued until the victim died.

Ms. Tallant testified that when the couple first moved to Tennessee, both she and her husband held jobs. However, once the couple's first son was born, she quit work to focus on raising her son while the defendant continued to work. Ms. Tallant testified that the defendant worked eight to ten hours per day, five days a week, with an irrigation business. Ms. Tallant testified that her husband held this job for a "good while" but he had either quit or was laid off once the couple's second son, Arson, the victim in this case, was born on April 27, 2002. Ms. Tallant testified that the defendant, who was not

employed after the victim was born, took care of the child eighty to eighty-five percent of the time. Ms. Tallant explained that she and the defendant agreed upon this arrangement because Ms. Tallant had been the primary caregiver for the couple's older son. Ms. Tallant testified that while the defendant was the victim's primary caregiver, she did take the victim to the doctor's office for routine visits "about five times."

Ms. Tallant testified that her older son did not hurt the victim. She also said that the couple had two pit bulls, but that the dogs did not hurt the baby either. She testified that the victim was never left alone, and while one of the defendant's cousins visited the house, this cousin never took care of the victim.

Ms. Tallant testified that the defendant, who she described as a "very hard person to read," did not like being watched. Ms. Tallant said that if she would watch him, the defendant would ask her "why are you always watching me?" She also said that if the victim would cry, the defendant "would always question me why I was always watching him and hovering over him."

Ms. Tallant recalled that the day the victim died, she spent most of the day at home with her two children while the defendant was out retrieving a part for the couple's car. She testified that the victim seemed fine, though he seemed a little cold and did not eat much. Ms. Tallant recalled that around 6:00 that evening, the defendant returned home. The defendant asked her if she would be taking the dogs for a walk; she replied that she would not because she wanted to stay with her son, who was not feeling well. The defendant insisted that she take the dogs out because she had promised the dogs that she would do so. At that point, Ms. Tallant said that she would walk the dogs. She left the family's residence around 7:30 p.m. and returned between 8:30 and 9:00 p.m.

Upon her return, Ms. Tallant noticed that the defendant held the victim in his lap. Ms. Tallant told her husband that the baby looked blue and "kind of cold." The defendant told her that he had just given the baby a bath and that the baby was fine, though the baby had not eaten when he tried to feed him. Ms. Tallant told the defendant to refrain from feeding the victim if he did not want to eat, and she then took her oldest son into the bathroom and gave him a bath. She then took a bath herself, read to her oldest son for a while before putting him to bed, and then went to the living room. Ms. Tallant noticed that the defendant and the victim were in the couple's bedroom with

the light off. She then went into the bedroom, where she noticed the defendant lying on his back on the bed, with the victim lying on top of the defendant's chest. According to Ms. Tallant, the victim looked "lifeless." She asked her husband if anything was wrong and noted that the victim did not appear to be breathing. The defendant replied that everything was fine, and Ms. Tallant exited the bedroom.

A short time later, Ms. Tallant re-entered the bedroom and turned on the light. She looked at the victim, noticed that he "didn't look right to me," and then told her husband that she would call 911. Ms. Tallant said that the defendant, who was angry over this prospect, told her not to call 911 and said that he would divorce her if she did call. Ms. Tallant called 911 anyway. The tape of the 911 call was then played in open court. Although neither the recording nor a transcript of the call appears in the record, the trial transcript indicates that during the call, Ms. Tallant told the defendant, "I don't give a s—what you think. This is my son." Ms. Tallant testified that she told this to her husband because he was upset that she had called. She also testified that during the call, she told her husband that she was serious; she explained that she made this statement because the defendant "laughs at everything. Everything is funny to him." During the call, Ms. Tallant testified that she told the police to hurry to the home. After hanging up, Ms. Tallant went through the house and attempted to hide some drugs that were in the house.

Ms. Tallant testified that she had seen the victim turn blue on one other occasion, when he fell when he was about one month old. Ms. Tallant explained that on this occasion, she returned home from taking her older son to the doctor when the defendant told her that the victim fell. According to Ms. Tallant, the defendant told her that he gave the victim a bottle, and the victim found the bottle to be too hot. At that point, the victim jumped, kicked, and fell from the couch to the floor, a distance of about one foot. Ms. Tallant testified that the floor onto which the victim fell was wooden, with a carpet covering part of it. Ms. Tallant testified that the side of her son's face was bruised, but several hours after she first noticed the bruising, it went away. Ms. Tallant said that neither she nor the defendant took the victim to the doctor in connection with this incident.

Ms. Tallant testified that in the days immediately following this incident, the victim would cry whenever she attempted to pick him up. She then noticed that the victim's right arm was swollen at the elbow. Ms. Tallant told her husband that the arm was swollen, and she wrapped the arm in a bandage. Ms. Tallant also testified that the defendant kept the baby in a car

seat for twenty-four consecutive hours so that the baby would not move his arm. Ms. Tallant testified that she did not know at the time that the victim's arm was broken.

Ms. Tallant testified that once, after the child received an inoculation in his left leg, she noticed that the leg was swollen. She then called the doctor's office and asked what to do. She testified that she was told to massage the leg, give the baby some baby Tylenol, and give him a warm bath. Ms. Tallant testified that she followed these instructions, but the baby's leg continued to swell. She also testified that when she massaged the leg, the victim would cry as if he were in pain. Ms. Tallant testified that she did not know at the time that the baby's leg was broken, and she also noted that the defendant did not tell her anything about the baby's leg.

Ms. Tallant testified that shortly after the victim's arm became swollen, the defendant attempted to "x-ray" the victim's arm by taking a lamp with a 500–watt bulb and holding it close to the baby's arm. The defendant told his wife that while he held the lamp in one hand, he held a pillow over the baby's face to keep the light out of his eyes. Ms. Tallant said that the defendant told him that the pillow slipped, and when the baby attempted to grab it, the lamp somehow came into contact with the baby, burning him on his right arm and stomach. After the incident, the baby's parents decided that when they took the child in for his next check-up, they would tell the doctor that the baby had suffered the burns when the lamp was accidentally knocked over and fell on the baby. Ms. Tallant said that at the time she learned about the burns, she believed that they had been accidentally inflicted.

Ms. Tallant acknowledged that some of the scratches that were seen under the victim's chin upon his death probably resulted from when the defendant would hold the victim's mouth shut so that the victim would stop crying. Ms. Tallant said that she saw the defendant hold the baby's mouth shut a couple times. She also recalled that the defendant would toss the victim into the air in a playful manner. Ms. Tallant did not recall whether the defendant did this before or after she noticed the baby's leg had become swollen. She also recalled seeing the defendant throw the victim onto a beanbag chair on two occasions. Ms. Tallant also testified that on one occasion, the defendant placed a wet paper towel into the baby's mouth in an attempt to silence him.

Ms. Tallant said that on some occasions, the defendant would sit the baby on his (the defendant's) knees and bounce the child up and down in an attempt to burp him. Ms. Tallant recalled that when the defendant did so, the baby's head would "kind of dangle because he was only a couple of months old. He didn't have enough strength to hold his own head up." She also testified that about one week before the baby died, she noticed an area of redness on the baby's bottom. Ms. Tallant asked the defendant what was wrong, and the defendant replied that he had put baby powder on the child's bottom, which led to a rash. Ms. Tallant testified that she did nothing to that part of the child's body to hurt it. She said that when she took the baby's temperature, she did not use a rectal thermometer.

Ms. Tallant testified that approximately one week before the victim died, she and the defendant drove to Sweetwater, Tennessee, with their two children to visit a friend. After arriving at the friend's house, the friend informed Ms. Tallant that the baby had quit breathing. Ms. Tallant gave the baby to the defendant, who then blew into the baby's mouth. According Ms. Tallant, this action "brought [the baby] back." Ms. Tallant testified that neither she nor the defendant sought medical attention for the child after this incident because the defendant told her that the baby would be okay. Ms. Tallant testified that after the family returned to Knoxville, the defendant then went back to Sweetwater, where he spent two to three days making methamphetamine.

Ms. Tallant testified that she was aware that methamphetamine was found in the baby's system at his death. She testified that she took methamphetamine while she was pregnant with the victim, but that she never put methamphetamine in the baby's bottle. She also said she never put the drug up the baby's nose or injected the drug into the baby's body.

On cross-examination, Ms. Tallant testified that the day after the victim died, she gave a statement to police in which she said that neither she nor the defendant had done anything to hurt their child. Ms. Tallant stated that upon returning to her home after giving that statement, investigators from the Department of Children's Services (DCS) arrived at the home and took the couple's older child into state custody. After the DCS visit, Ms. Tallant gave a second statement to police, in which she again stated that neither she nor the defendant had done anything to hurt the victim. At the conclusion of this second statement, Ms. Tallant and Detective Slagle, who took the statement, got into an argument, which led the police to place Ms. Tallant into a police interrogation room. According to the statement, parts of

which were read into evidence, the police placed the defendant and Ms. Tallant under arrest for first degree murder at that point, but Ms. Tallant testified that she did not recall being informed that she was under arrest. What Ms. Tallant did recall was that after being placed in the interrogation room, she gave another statement to another police investigator, Wallace Armstrong, in which she implicated her husband in the baby's death. Ms. Tallant testified that this statement was a coerced statement which she made in an attempt to regain custody of her older son. While she stated that this statement was coerced, she claimed that the statement, like the ones she had given earlier, was true. Ms. Tallant testified that at the time she gave her third statement, "I knew all of this stuff was going on, but I didn't think it consisted of death, to me, at the time." Ms. Tallant said that after giving this third statement to police, she was taken into custody, where she remained at the time of this trial.

Ms. Tallant testified that she retained separate counsel, one who was not an employee of the Public Defender's office. She recalled that she, the defendant, and counsel for both parties met monthly from August 2002 to October 2004. During one of these meetings, the parties discussed Ms. Tallant's statements to police. At that time, she told her husband and the involved attorneys that her statements to police were either lies or grossly exaggerated. At trial, Ms. Tallant testified that she did exaggerate some of her statements to police. However,

> At the time that all this stuff had happened, I didn't think that it was—the way I told the cops was different—I put a different spin on it, as to when I was at home and all this stuff happened. Like on my statement, it sounded mean and evil, and [the defendant] did this ... [the defendant] did that. But at home, I was not thinking that. I was thinking that everything was fine. Even though a lot of things happened, I still thought that everything was fine. But when I got to the police station, I made it sound like I didn't like none of the things he was doing at the time.

Ms. Tallant stated that she made her statements in the manner she did because the police "had told me I wasn't going home if I didn't blame it on [the defendant]. So I wanted to make it possible that I was going to go home."

During cross-examination, Ms. Tallant admitted that several particular parts of her statement to police were untruthful. She said that her statement to police that the defendant had hit her frequently was a lie. Ms.

Tallant said that the defendant never hit her during their marriage. She also admitted that her statement that the defendant would place the baby in a car seat and shake it violently was a lie. Ms. Tallant admitted that the defendant placed the baby in a car seat only once, when the defendant was attempting to keep the baby from moving his injured arm. Ms. Tallant also admitted that she put the baby in a car seat for brief periods while she was performing household chores. Ms. Tallant also said that her statement that the baby would scream whenever the defendant came close to him was a lie. Finally, she admitted that her statement to police that the defendant kept her from seeing the baby was a lie. She testified that the defendant was the baby's primary caretaker, but that arrangement had been agreed upon by both parents.

Ms. Tallant also identified certain parts of her statements to police that had been exaggerated. She said that her statement to police that the defendant would throw the baby into the air was an exaggeration. Rather, the defendant would hold the baby in the air and then drop his hands about six inches. During that time, the defendant would never lose contact with the baby. Also, she admitted that her statement that the defendant would throw the baby into a beanbag chair was an exaggeration. Rather, the defendant would drop the baby onto the chair from a few inches above the chair.

On several occasions during cross-examination, Ms. Tallant said that she never saw the defendant do anything to intentionally hurt the victim. Regarding the scratches under the baby's chin, she noted that she saw them during the three months the baby was alive, though she could not recall the exact date on which she saw them. She also recalled seeing the defendant holding the baby's mouth shut, but she did not recall the exact dates on which the defendant did this. Ms. Tallant admitted that in her meetings with the defendant and counsel, she had said that the first time she saw the scratches was the day the victim died.

Ms. Tallant testified that she had no idea how methamphetamine was introduced into her son's system. Regarding her own drug use, she said that she used methamphetamine every day during her pregnancy, and that her methamphetamine use increased after the victim was born. She also said that she smoked marijuana during her pregnancy, and that she smoked cigarettes until her fifth or sixth month of pregnancy. Ms. Tallant admitted that she used methamphetamine when she woke up each morning and took a smaller amount in the afternoon. She stated that she did not always wash her hands

after using. She also stated that she had previously told the defendant and counsel that she prepared all of the baby's formula bottles.

Ms. Tallant admitted that from August 2002 to October 2004, she frequently wrote letters to her husband. She stated that in those letters, she told her husband that she believed he was innocent, and she told the defendant that she had implicated him in the victim's death so that she could be set free. Ms. Tallant stated that at the time she wrote the letters, she did not believe that her husband did anything to intentionally hurt the victim, and that she still felt the same way at trial.

Ms. Tallant testified that in October 2004, she gave a "statement" to the District Attorney General. Defense counsel asked Ms. Tallant several questions about this statement, actually a deposition, to assess the deposition's validity. Ms. Tallant said that in her deposition, she told the district attorney that she did not know that the victim had suffered any broken bones and had no explanation as to how the victim could have suffered those injuries. She stated that this statement was consiste[nt] with her testimony at trial. She also told the district attorney that she was unaware that the child had pneumonia, and that she did not see any evidence of injury to the victim's rectum. She also recalled telling the district attorney that she had never seen a bruise on the child's body except shortly after the defendant told her that the baby had fallen from the sofa. She also noted that she told the district attorney that the only external injuries that she had ever seen on the victim were this bruise and the burns to the baby's stomach and hand.

Ms. Tallant testified that the evening her son died, she may have returned home at 8:15, rather than 8:30 or 9:00 as indicated on direct examination. She admitted that if she did arrive home at 8:15 and the 911 call was not made until 10:40, some two hours passed between her returning home and calling 911. She stated that she "knew" her husband was under the influence of some drug when she returned home, yet she believed her husband when he said that the victim was fine. She said that she believed her husband because when their older son was younger, she was "always" thinking something was wrong with the boy, and the defendant, despite being "high" believed that the boy was okay, and the defendant turned out to be right.

Ms. Tallant testified that during her meetings with the defendant and counsel, she had said that her husband left for Sweetwater to make methamphetamine on the Thursday before the victim died. She said that the

defendant remained gone until Monday or Tuesday, and that he was gone most of the day on Wednesday, the day the victim died. At trial, though, Ms. Tallant said that the defendant did not go to Sweetwater by himself until the Saturday or Sunday before the victim died, and that he returned on Monday, two days before the victim died.

Ms. Tallant testified that she changed the victim's diaper several times a day, and in the course of changing the diaper, she never saw any trauma to the child's rectum. She also testified that she never saw any cuts to the victim's groin, though she did notice that the baby had diaper rash. Regarding the broken bones, Ms. Tallant admitted that during her previous meetings with the defendant and counsel, she had stated that she believed that the victim[']s ribs, arm, and leg were broken in June 2002, when the baby fell. When asked if she still believed this to be true, Ms. Tallant replied, "I guess. Yeah. I don't know if it's true or not."

On redirect, Ms. Tallant said that the police did not tell her to lie to them in an attempt to implicate the defendant. She also testified that her deposition in connection with this case was truthful, and that she was being truthful in her testimony at trial. She also reiterated that her husband did not have regular employment during the victim's life. Ms. Tallant said that the defendant "might have worked one day or a couple of days with a friend of his ... [installing] central heat and air, but he didn't have a job."

On recross, Ms. Tallant admitted that in addition to massaging the victim's swollen leg, she did some "bicycle type" exercises with the leg in an attempt to ease the pain in the baby's leg and lessen swelling. The court then had the witness answer questions from the jury. When asked why she was "not as protective" of the victim as she had been of her older son, Ms. Tallant replied that she had frequently thought something was wrong with her older son when in fact the child was fine.

Dr. Darinka Mileusnic–Polchan, a forensic pathologist, testified that she performed the autopsy on the victim, who was three and a half months old at his death. Dr. Mileusnic–Polchan first testified as to the thirty-one external injuries she noted on the victim. The first three injuries she noted were on the left side of the baby's face. . . . Dr. Mileusnic–Polchan testified that each injury, by itself, would not be cause for concern, but the injuries taken together did concern her.

The first injury that particularly concerned Dr. Mileusnic–Polchan was a group of ten "irregular abrasions" under the victim's chin. She noted that the injuries were in "different stages of healing, meaning some [were] fresh, some [were] old." Some of the abrasions were deeper than others, with some of the injuries reaching down to the subcutaneous tissue. Dr. Mileusnic–Polchan noted that there was also bruising around the abrasions. Dr. Mileusnic–Polchan opined that "10 of them in this area, with a lot of bruising, this is ... a red flag. This is very, very concerning." She also stated that an injury in this area should "never happen. This is something that you don't inflict upon a baby with the regular care and not even with regular roughhousing. This is something that is inflicted .... it's evidence of foul play in addition to some other evidence of injury."

Dr. Mileusnic–Polchan then noted the external injuries present on the back of the victim's head. She noted bulging in the fontanelle, which is the membrane connecting the bones of the scalp before the bones ossify and fuse together. She noted that this injury by itself was insignificant and was not truly an injury, but rather was indicative of swelling within the brain. She also noted a 0.4 inch abrasion on the back of the victim's head, near the top of the head. Dr. Mileusnic–Polchan noted that the injury by itself was not concerning, as this type of injury was often sustained during resuscitation efforts, but the injury was concerning in light of the other injuries.

Dr. Mileusnic–Polchan testified that the victim suffered "multiple horizontal irregular stretch abrasions" on his neck. . . . [noting] that these injuries were often common in motor vehicle accidents. Dr. Mileusnic–Polchan also noted the presence of a 0.7 inch abrasion on the left side of the victim's neck. Like many of the other injuries, she noted that this injury by itself was insignificant but worrisome in light of the other injuries.

Dr. Mileusnic–Polchan noted that the victim experienced tearing in both frenula, the membranes connecting his lips to his gums. She noted that these injuries constituted "child abuse until proven otherwise." She noted that this injury is not caused by regular resuscitation. Rather, the injury is caused by something being "forcefully pushed in the baby's mouth, frequently a bottle, forceful feeding or some sort of other object." Dr. Mileusnic–Polchan testified that these injuries were showing signs of healing, meaning that the victim had suffered them several days before he died.

Dr. Mileusnic–Polchan noted several abrasions and areas of abrasions and discoloration on the victim's chest and abdomen. . . .

Dr. Mileusnic–Polchan then testified regarding the injuries on back side of the victim's body. She noted that the victim had a 0.3 inch abrasion on the back of his neck. She opined that the injury had been there about a week. She then identified a "U-shaped" injury on the victim's back, consisting of two parallel abrasions, one 0.6 inches in length and the other 1.1 inches long. She also identified bruising around the abrasion. Dr. Mileusnic–Polchan testified that this injury was "really well-defined ... meaning that some sort of object that was shaped, U-shaped or maybe square-shaped" came into contact with the victim's back. As to the cause of the injury, Dr. Mileusnic–Polchan testified that "[e]ither the baby was hit with something or was thrown on the ground that had some U-shaped object on the ground." Dr. Mileusnic–Polchan said that she could not identify the exact cause of the injury, but noted that it was indicative of blunt-force trauma.

Dr. Mileusnic–Polchan noted that the victim had a 0.2 inch abrasion on his left buttock. She also identified an area of abrasions, bruising, and skin tears near the child's anus. Dr. Mileusnic–Polchan noted that some of the skin tears were deep, reaching to the subcutaneous tissue. She also noted the presence of a hematoma. Dr. Mileusnic–Polchan examined skin samples from the anal area under a microscope; when she did so, she noted "extensive" hemorrhaging but little accompanying inflammatory reaction. Dr. Mileusnic–Polchan testified that this meant that the injury occurred within a day of the victim's death. Dr. Mileusnic–Polchan opined that these injuries were caused by blunt-force trauma, though she could not identify what object actually caused the injury.

Dr. Mileusnic–Polchan testified that the victim had some evidence of diaper rash. She also noted a series of abrasions in its groin. Some of these abrasions were of the "normal" variety, while some were stretch abrasions similar to the ones that were evident on the victim's neck. . . .

Dr. Mileusnic–Polchan noted bruising on each of the victim's elbows. She noted that these injuries were troubling because "[t]he elbows are very rare areas for a baby that age to be injured. They're not mobile. They don't move by themselves, and to fall on the elbow or explain elbow region by accident, that's really extremely rare, even if possible."

Dr. Mileusnic–Polchan noted that the child's left thigh was "very swollen, very deformed," and the bruising around the thigh was evident of a "combination of recent and old injury." She later noted that her internal exam

of the area surrounding the leg produced "evidence of hemorrhage, fresh and healing, meaning that the leg was reinjured" and that the "additional injury could have [occurred] ... nonintentionally as opposed to the injury that caused it originally." She also identified two burns, one on the child's abdomen, and the other on the victim's right hand.

Dr. Mileusnic–Polchan then testified regarding the child's internal injuries. She first identified several broken ribs, some which had healed, and others which had not. Regarding the level of pain accompanying these injuries, Dr. Mileusnic–Polchan testified that bone fractures are among "the most painful pediatric emergencies."

She also identified an area of hemorrhaging and abscess formation on the left side of the victim's chest. Dr. Mileusnic–Polchan noted that "some of those [rib] fractures ... injured surrounding vessels and muscle [and] induced or produced abscess, meaning infection, meaning pus collection." Dr. Mileusnic–Polchan noted that her microscopic review of these chest injuries led her to conclude that the injuries occurred within a day of the victim's death.

Dr. Mileusnic–Polchan noted that the victim suffered a deep intramuscular hemorrhage in his left upper back. Dr. Mileusnic–Polchan performed a microscopic exam of this hemorrhage, during which she found evidence of "recent hemorrhage with no surrounding inflammatory reaction, suggesting a very recent" injury. She testified that some of the back injuries occurred within a day of the victim's death. Dr. Mileusnic–Polchan also noted that the victim suffered hemorrhaging in his diaphragm. After performing a microscopic review of this injury, Dr. Mileusnic–Polchan concluded that these injuries had occurred three to five days before the victim died.

She also noted a "rusty brown discoloration" around the spinal cord, indicating a hemorrhage that had occurred five to seven days before the victim died. . . .

Dr. Mileusnic–Polchan testified that when she examined the victim's lungs, she discovered that the child had been suffering from "infection of the lungs. . . pneumonia, and also pleurities or infection inside the chest cavity." Regarding the infection to the child's lungs, she noted:

His right lung was completely obliterated with infectious process, and there was no left alveolar space or any area of the lung that he would actually use—could use for breathing, and the—in the left lung, the infection was a slightly lesser degree, but still there was presence of ... developing infection.... [There was] also even focal abscess formation in the lung tissue itself. So the ultimate mechanism of [the victim's] death would be severe pneumonia, inability to breath[e]. However, this pneumonia was brought on by his extensive injuries, particularly the rib fractures.

When asked if these injuries were accidental, Dr. Mileusnic–Polchan noted:

There was no way that some of the injuries would ever be an accident in a baby three and a half months old, and the multiplicity, the distribution, and severity of some of the injuries completely takes it out of [the] realm of any sort of accident and makes it a homicide and child abuse.

On cross-examination, Dr. Mileusnic–Polchan testified that the injuries under the victim's chin were likely caused by a fingernail. She also testified that she had no way of knowing the exact manner in which the methamphetamine found in the victim's system was ingested, but that it could have been ingested through a formula bottle administered close to the victim's death. . . .

The defendant presented several witnesses from the Knox County Health Department who interacted with the victim and his parents to varying degrees. Two registered nurses, Joyce McGinley, and Sarah Croley, each testified that they met with the victim once, with McGinley meeting with the victim and both parents on June 10, 2002, and Croley meeting with the victim and his mother on July 31, 2002. Each nurse testified that her meeting consisted of talk[ing] to the baby's parent or parents about the victim's general progress. McGinley did not recall whether she physically examined the victim, but she noted that administering physical exams was generally not in her job description. She noted that based on her review of the "crib card" that had been compiled at the time of the child's birth, the victim's health and growth appeared to be normal. Croley testified that the victim did not appear to be in any distress during her meeting with the victim and his mother, but that she did not physically examine the child during the meeting.

Two Women, Infants and Children (WIC) program nutrition educators with the Knox County Health Department, Nina Garton and Autumn McElhaney, testified that they each met the victim once—Garton met with the victim and both parents in either May or June 2002, and McElhaney met with the victim and his mother on July 31, 2002. . . . Both Garton and McElhaney testified that their notes from these meetings indicated no abnormalities or signs of distress regarding the victim, but both women testified that they had little recollection concerning their visits with the victim.

Karen Goodrick, a nurse practitioner, testified that she was employed by the Knox County Health Department when Sarah Tallant brought the child in for three well-child exams between May and July 2002. During the examinations, Goodrick did not notice any problems with the victim that would have suggested that he was being physically abused. She said that the child did not experience any distressed breathing and did not appear to be in pain during the visits. During the last exam, which took place on July 10, Goodrick performed a test on the victim's legs to check his hip placement. The test involved pushing the child's legs up, out, and back, and although Goodrick said that this exam was "relatively stressful" for most children, the victim did not encounter any pain during the test. Goodrick testified that Sarah Tallant explained that the burns the victim suffered occurred when the defendant (who was not present at any of these three exams) and the victim's older brother were playing on the floor and knocked over a lamp, which fell on the victim. Goodrick said that this answer seemed satisfactory at the time and did not cause her concern. On cross-examination, Goodrick testified that she had seen the autopsy photographs, and during her examinations of the victim, she did not notice any of the external injuries evident in the photographs. She also admitted that she did not see the victim between his July 10 visit and his death on August 14.

Kathi Zechman, a licensed practical nurse, testified that she gave the victim two rounds of immunizations during two visits to the Knox County Health Department. On May 8, 2002, she administered a hepatitis B shot in the victim's thigh, and on July 10, 2002, she gave the child two shots in his left leg and two shots in the right leg. Zechman testified that she did not notice any swelling in the baby's legs during the visit, and other than a burn on the baby's hand, which she discussed with Goodrick, she noticed no physical problems with the child. Zechman testified that her administration of the immunizations could not have caused the broken leg suffered by the victim, nor could she have caused the rib fractures the victim suffered. She

also noted that if the baby were crying or "particularly fussy," she would not have made a note of it.

Jason Turnblazer testified that between April and August 2002, he employed the defendant at his irrigation and landscape lighting business. Turnblazer insisted that although he had no employment or payroll records regarding his now-defunct business, the defendant attended work every day and was a good employee. On cross-examination, Turnblazer admitted that he mainly kept in contact with the foreman on each jobsite, rather than the individual employees. Turnblazer also admitted that he did not recall the defendant informing him about the victim's birth, and that he heard about the victim's death through media reports. Turnblazer also testified that the defendant was no longer working for him when he learned that the victim had died.

Glenn "Sonny" Gish, the defendant's stepfather, testified that he interacted with the victim only once, during a two-day visit to the Tallant home in July 2002. Gish testified that during the two days he and his wife visited with the victim, his parents, and the victim's older brother, he noticed no problems with the victim. Gish testified that the victim did not appear to be in pain during the visit. Gish testified that he saw burns on the victim's hands and stomach, and when he asked the defendant and his wife about the burns, they told him that the defendant and his older son had been playing on the floor when they knocked over a lamp, which fell on the victim. Gish testified that this explanation did not distress him. On cross-examination, Gish testified that the victim's burns were bandaged and he did not see the victim's skin underneath the bandages. Gish also testified that the house was clean and he did not see anyone in the house using drugs, but admitted that because he did not use drugs, he would not have known whether the defendant or his wife were using drugs if in fact they were.

Bettye Tallant, the defendant's mother and Sonny Gish's wife, testified that she visited the defendant, his wife, and their children in July 2002. Like her husband, she also testified that there were no noticeable problems concerning the victim during her visit. She said that the victim did not cry any more than a normal child his age. Ms. Tallant did testify that one of the victim's arms appeared slightly swollen during the visit, and after she saw the defendant pull the child up by that arm, she told the defendant not to pull the child up by his arm, because the defendant may pull the arm out of its socket. Ms. Tallant testified that she did not seem too concerned by the child's swollen arm or the defendant's pulling the child's arm. On cross-

examination, Ms. Tallant admitted that she was not aware that the defendant and his wife were regular methamphetamine users.

*State v. Tallant*, No. E2006-02273-CCA-R3CD, 2008 WL 115818, at *1–16 (Tenn. Crim. App. Jan. 14, 2008) *perm. app. denied* (Tenn. June 30, 2008) ("*Tallant I*"). After hearing the testimony described above, a Knox County jury convicted Tallant of two counts of first-degree felony murder (with an underlying felony of aggravated child abuse in one count and an underlying felony of aggravated child neglect in the other), one count of second-degree murder,[1] and two counts of aggravated child abuse. *See id.* Tallant's convictions and sentences were affirmed on appeal. *Id.*[2]

On or about September 3, 2008, Tallant filed a pro se petition for post-conviction relief in the trial court [Doc. 27-36 pp. 5-30]. An amended petition was filed with the assistance of appointed counsel on June 13, 2013, and an evidentiary hearing was held on July 2, 2013 [*Id.* at pp. 57-57, 78]. The issues and evidence presented at the hearing were summarized by the Tennessee Court of Criminal Appeals as follows:

> [T]he petitioner testified that he told all four of the attorneys who were, at one time, on his defense team that he wanted to testify. He said that one of the junior counsel told him that he would start preparing his testimony about three weeks before the start of the trial, but he never did because he ran for judicial office a few months before the petitioner's trial. In the meantime, senior counsel kept trying "to manipulate [the petitioner]" into saying that he did not want to testify. According to the petitioner, senior counsel, reminding him of his history of manufacturing methamphetamine, told him that he

---

[1] Tallant was found not guilty of premediated first-degree murder but was convicted on the lesser-included offense.

[2] Tallant's case was remanded for merger of the two aggravated child abuse convictions and for a new sentencing hearing regarding consecutive sentences. *Tallant I*, 2008 WL 115818, at *34.

would be "hangin[g] [himself]" if he testified. He acknowledged that the trial court reviewed his rights with him at the trial. He insisted, however, that the only reason he told the trial court that he did not want to testify was because he had been manipulated by senior counsel.

The petitioner testified that the trial court denied counsel's request for a bill of particulars. Although he had not understood its importance at that time, he had since researched the issue and believed that it would have greatly helped his case for the State to have been required "to categorize all the injuries to dates and times." He explained that he believed that, with a bill of particulars, defense counsel could have separated the victim's various injuries into those that occurred on the date of his death and those that occurred when the petitioner was not present in the home. He said that counsel did not include the trial court's denial of the bill of particulars as an issue on direct appeal.

The petitioner testified that senior counsel raised an issue on direct appeal about the seating of three jurors, but did not include the jury questionnaires in the record, which resulted in the Court of Criminal Appeals stating in its direct appeal opinion that it was unable to fully review the issue.

On cross-examination, the petitioner acknowledged that his defense team had weekly meetings with him at the jail. He further acknowledged that his counsel argued on more than one occasion for the bill of particulars but that the trial court ultimately ruled in favor of the State. On redirect, he said that, had he testified at trial, he would have been able to explain that he was away from home from the Friday through the Monday night prior to the victim's death.

Senior trial counsel, the District Public Defender for Sixth Judicial District, testified that he had been licensed to practice law for thirty-three years and had been the public defender for the past twenty-three years. His office began representing the petitioner in 2002, with the case culminating in the petitioner's trial in April 2006. At the beginning there was some talk about the State filing a death notice, so the Administrative Office of the Courts allowed him to associate an outside counsel. In addition, two of the attorneys in his office also worked on the case. Although each of those other three lawyers left over time, there were four lawyers working on the petitioner's defense team "for the most part." Other people on the defense team included an investigator, a mitigation specialist, and "an administrative person." Senior trial counsel testified that he and his team met weekly with

the petitioner at the jail, holding over 70 joint defense meetings with Ms. Tallant and her defense team and approximately 120 separate meetings with the petitioner alone. He explored several defense options, including the possibility that the victim suffered from osteogenesis imperfecta, or "brittle bone" disease. To that end, he consulted with an expert in the field and obtained permission from the court to have the victim's blood sent to Tulane for genetic testing, the results of which were that the victim did not suffer from that disease. Counsel testified that he also obtained permission and funding to hire an expert in pediatric forensic pathology, who reviewed the findings of the State's medical experts and agreed with their conclusions that the victim's injuries were indicative of child abuse.

Senior trial counsel testified that he had "multiple conversations" with the petitioner about whether he would testify. He said the petitioner believed that counsel could simply "stand up and tell the jury" his version of events without the petitioner's taking the stand and expressed great frustration when he explained that was not the way it worked. Counsel stated that as their representation was ongoing, the petitioner "was giving [them] indications that he was not going to testify." He stated there were things that Ms. Tallant said that the petitioner wanted to tell the jury were not accurate, but the petitioner also described the thought of testifying as "a scary thing." Counsel stated that he told the petitioner that the district attorney would likely cross-examine him about each of the victim's injuries, which would mean that the petitioner would have "to take one of three positions generally: (a) I did it and it was an accident; (b) I didn't do it; I don't know who did; and I never noticed the injuries to my child; or (3[sic] ) I didn't do it; I noticed it; but I didn't do anything about it." According to his notes, he talked to the petitioner again about testifying on March 23, 2006, asking if he wanted to reconsider his decision. The petitioner, however, confirmed that he did not want to testify. Counsel said he made it clear that the decision was the petitioner's alone. The petitioner was adamant about his decision, telling counsel at one point, according to counsel's notes, "Make no doubt about it; I ain't testifyin.'"

Senior trial counsel testified that the defense theory they developed involved attempting to convince the jury that the State could not show that the petitioner was either responsible for the victim's first two "clusters" of injuries, or negligent for not noticing them, given that a trained nurse who saw the victim after the date of those injuries also failed to notice them. As for the third cluster of injuries, they attempted to show that the petitioner was

22

not present for most of the time frame in which those injuries occurred. The jury, however, rejected their theory.

On cross-examination, senior trial counsel testified that he could not recall the petitioner's level of education or IQ but that he was "smarter than most clients," always asked questions, did a lot of independent research, and "was engaged." He said he never thought the petitioner's testimony would be helpful to his case. He did not recall having discussions with the petitioner in which he recommended that he either testify or not testify because the petitioner "was driving that train" and "knew what he wanted to do." Instead, he challenged him by inquiring whether he was sure not testifying was what he wanted to do. He also had "lots of discussions" with the petitioner about what he would say if he decided to testify and how his testimony would open the door for the State to inquire into "a lot of other stuff."

Senior trial counsel testified that they filed and argued for the bill of particulars but were denied by the trial court. He said he did not recall whether they raised the denial of the bill of particulars as an issue on direct appeal and said that, if they did not, he could not say why. However, he thought they were successful in categorizing the victim's injuries into three separate "clusters" that occurred over three different time frames.

Senior trial counsel testified that the trial judge "was extremely possessive" of the jury questionnaires, which he kept in his office and required counsel to turn back in after the jury was selected. He conceded, however, that it was "an error on [his] part" not to make the questionnaires part of the record on appeal.

*Tallant v. State*, No. E2013-01827-CCA-R3PC, 2014 WL 3513170, at *14–16 (Tenn. Crim. App. July 15, 2014) *perm. app. denied* (Tenn. Dec. 17, 2014) ("*Tallant II*").

Thereafter, the post-conviction court entered an order denying the petition on July 24, 2013, and Tallant appealed that decision to the Tennessee Court of Criminal Appeals, which affirmed on July 15, 2014. *Id.* [*See also* Doc. 27-36 pp. 63-103, 104-05].

Aggrieved, Tallant timely filed the instant petition asserting the following claims, as summarized by the Court:

Claim One:     Tallant's convictions are based on insufficient evidence.

Claim Two:     The trial court erred in failing to sequester the jury and in failing to dismiss three challenged jurors.

Claim Three:   The trial court erred in allowing the medical examiner to testify about injuries unrelated to the victim's cause of death.

Claim Four:    The trial court's failure to grant Tallant's motion to suppress was not harmless error.

Claim Five:    Tallant's constitutional protection against double jeopardy was violated when he was convicted for both felony murder and the underlying felonies.

Claim Six:     Tallant was denied the effective assistance of trial counsel.
   a.  Counsel rendered ineffective assistance in manipulating Tallant not to testify;
   b.  Counsel rendered ineffective assistance failing to require bill of particulars; and
   c.  Counsel rendered ineffective assistance in addressing jury seating issues.

Claim Seven:   Tallant was denied the effective assistance of post-conviction counsel.
   a.  Post-conviction counsel rendered ineffective assistance in failing to argue that appellate counsel was ineffective for failing to press the following prosecutorial and/or juror misconduct claims on direct appeal:
      i.   The prosecution elicited false testimony from Sarah Tallant;
      ii.  The prosecution talked to impaneled jurors outside of court; and
   b.  Post-conviction counsel rendered ineffective assistance in failing to argue appellate counsel's ineffectiveness on appeal of the post-conviction court's decision.

[Doc. 1]. After review of the petition, this Court ordered Respondent to answer Tallant's

allegations, and Respondent complied by filing his answer on December 15, 2015 [Doc.

24

12].  Tallant filed a reply to Respondent's answer on March 28, 2016 [Docs. 18 & 19].

Tallant subsequently moved to expand the record, to request the appointment of counsel,

and to seek an evidentiary hearing in this cause [*See* Docs. 20-24].  Tallant's motions were

denied by Memorandum and Order entered May 9, 2016 [Doc. 26].

## II.   <u>LEGAL STANDARD</u>

The Court's review of the instant petition is governed by the Antiterrorism and

Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal

habeas relief on any claim adjudicated on the merits in state court unless that adjudication

(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established United States Supreme Court precedent; or (2) resulted in a decision

based on an unreasonable determination of facts in light of the evidence presented.  *See* 28

U.S.C. § 2254(d)(1) & (2); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

Federal habeas relief may be granted under the "contrary to" clause where the state

court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question

of law; or (2) decides a case differently than the Supreme Court on a set of materially

indistinguishable facts.  *See Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  Under the

"unreasonable application" clause, a federal court may grant relief where the state court

applies the correct legal principle to the facts in an unreasonable manner.  *See id*. at 407-

08; *Brown v. Payton*, 544 U.S. 133, 141 (2005).  Whether a decision is "unreasonable" is

an objective inquiry; it does not turn on whether the decision is merely incorrect.  *See*

*Schriro*, 550 U.S. at 473 ("The question under the AEDPA is not whether a federal court

believes the state court's determination was incorrect but whether that determination was unreasonable —a substantially higher threshold."); *Williams*, 529 U.S. at 410-11. When evaluating the evidence presented in state court, a federal habeas court presumes the correctness of the state court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas review is also limited by the doctrine of procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the state court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 731-32, 735 n.1 (1991). A procedural default may be circumvented, allowing federal habeas review of the claim, only where the prisoner can show cause and actual prejudice for the default, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Id.* at 750; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90-91 (1977). "Cause" is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules, or that his trial counsel rendered ineffective assistance. *See id.* at 753. The "prejudice" sufficient to overcome a default

must be actual, not merely a possibility of prejudice.  *See Maupin v. Smith*, 785 F.2d 135, 139 (6th Cir. 1986) (citations omitted).

## III.   <u>CLAIM ONE</u>

Tallant first claims that the evidence presented against him at trial is insufficient to support his convictions.  Tallant presented this claim on direct appeal, and the Tennessee Court of Criminal Appeals denied the claim, nothing that Sarah's "testimony that [Tallant] was the primary caretaker and the medical examiner's testimony that these injuries could not have been accidentally inflicted were particularly significant and could have led the jury to reasonably conclude that the evidence excluded all reasonable hypotheses except for the guilt of [Tallant]."  *Tallant I*, 2008 WL 115818, at \*17.

In *Jackson v. Virginia*, the Supreme Court held that in reviewing the sufficiency of the evidence, courts ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Tallant claims that the circumstantial case against him fails to meet this standard, as no witness could testify who caused the injuries to Lex, and testimony established that Tallant lacked access to the child during the relevant time periods. Therefore, he asserts, the record shows that the state courts clearly erred in finding the evidence sufficient to support his convictions.

The state appellate court noted the following regarding the essential elements of the crimes with which Tallant was charged:

27

> To convict the defendant of felony murder, the state was required to prove beyond a reasonable doubt that the defendant killed the victim during "the perpetration of or attempt to perpetrate ... aggravated child abuse [or] aggravated child neglect." Tenn. Code Ann. § 39–13–202(a)(2) (2003). Regarding felony murder, the state is not required to prove a culpable mental state except that necessary to commit the underlying enumerated offense. *Id.* § (b). To convict the defendant of aggravated child abuse and neglect, the state was required to prove beyond a reasonable doubt that the defendant "knowingly, other than by accidental means, treat[ed] a child under eighteen (18) years of age in such a manner as to inflict injury or neglect[ed] such a child so as to adversely affect the child's health and welfare," and that such treatment resulted in serious bodily injury. Tenn. Code Ann. §§ 39–15–401(a), –402(a)(1) (2003).

*Tallant I*, 2008 WL 115818, at *17.

The Sixth Circuit has found that "[c]ircumstantial evidence alone is sufficient to support a conviction, and it is not necessary for the evidence to exclude every reasonable hypothesis except that of guilt." *Johnson v. Coyle*, 200 F.3d 987, 992 (6th Cir. 2000) (citation and internal quotation marks omitted). The record demonstrates that Lex suffered over two dozen rib fractures, five of which occurred shortly before his death, and expert medical testimony established that these broken ribs led to infection and pneumonia that ultimately cased Lex's death [Doc. 27-8 pp. 26-28; Doc. 27-10 p. 45]. A medical expert testified that, in combination with the numerous external injuries and the previously-broken femur and elbow, Lex's injuries demanded the conclusion that the injuries were not accidental but were, in fact, "homicide and child abuse" [Doc. 27-10 p. 46]. Further, testimony was offered to establish that Tallant was Lex's primary caretaker, and that Lex had been previously injured in the care of Tallant, who did not seek medical attention for the injuries [Doc. 27-8 pp. 69, 74, 85-86, 87-90]. Accordingly, based on the evidence

presented at trial, a rational juror could find that Tallant was guilty beyond a reasonable doubt of the offenses with which he was charged. Therefore, the sufficiency determination of the state court was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of facts in light of the evidence presented.

## IV.    CLAIM TWO

Tallant asserts that the trial court erred (1) in failing to sequester the jury due to media exposure and (2) in failing to excuse three jurors who were unqualified, thereby violating his Sixth Amendment right to an impartial jury [Doc. 19 p. 9].

The Sixth Amendment guarantees a defendant the right to a trial by an impartial jury. U.S. Const. amend VI. This right is effectuated by impaneling a jury of impartial jurors who render a verdict based on the evidence presented at trial. *Irvin v. Dowd*, 366 U.S. 717, 723 (1961). That is, an impartial jury is one composed of jurors who can "'conscientiously apply the law and find the facts.'" *Franklin v. Anderson*, 434 F.3d 412, 422 (6th Cir. 2006) (quoting *Wainwright v. Witt*, 469 U.S. 412, 423 (1985)).

### A.    Sequestration

As mentioned above, Tallant's jury was not sequestered. On appeal, citing the trial judge's discretion regarding sequestering the jury, the Tennessee Court of Criminal Appeals found that:

> In this case, the record reflects that on three separate occasions prior to trial—at the initial appearance of the venire in open court, at the outset of voir dire, and shortly after empaneling the jury—the trial judge admonished

the jury about the importance of "learn[ing] everything about this case from the courtroom" and ordered jurors to avoid exposing themselves to media coverage of the case. At the beginning of jury selection, the trial judge asked potential jurors if they had read anything in the newspapers about the case. None of the potential jurors indicated that the publicity had affected them; one potential juror admitted reading a headline in the newspaper, but after reading the headline, the potential juror read no further. Additionally, during voir dire, defense counsel asked a panel of potential jurors if they were sure that none of them had encountered any media coverage that would cause them to form an opinion about the defendant's guilt. All members of the panel responded in the affirmative. Beyond this general question, however, the defendant did not ask either individual members of the venire or panels of potential jurors if they had seen particular news stories regarding the case. Also, during trial, nobody involved in this case—the state, the defendant, the jury, or the trial court—raised any concern regarding the ability of the jury to perform its duties impartially in light of the media coverage. In light of this evidence, the defendant has failed to show that the media publicity regarding his case prejudiced him or that the trial court abused its discretion by declining to sequester the jury in light of the publicity. Thus, the defendant is not entitled to relief on this issue.

*Tallant I*, 2008 WL 115818, at *20.

A criminal defendant possesses a Sixth Amendment right to a fair, impartial jury, but he possesses no constitutionally-guaranteed right to jury sequestration. *See Young v. Alabama*, 443 F.2d 854, 856 (5th Cir. 1971) (holding jury sequestration is not a fundamental right); *King v. Elo*, No. CIV.98-CV-70882-DT, 2000 WL 791721, at *8 (E.D. Mich. May 25, 2000). The Court otherwise finds that the jury in this case was instructed multiple times to avoid reading about, listening to information about, or discussing the case [Doc. 27-3 pp. 136, 137, 138-39; Doc. 27-7 pp. 22-23, 104; Doc. 27-8 pp. 41, 101; Doc. 27-9 p. 99; Doc. 27-10 pp. 54, 114; Doc. 27-11 p. 86]. It is presumed that the jurors followed that instruction. *United States v. Metzger*, 778 F.2d 1195, 1209 (6th Cir. 1985) (presuming jury instructed not to read newspaper follows instruction even when prejudicial

media coverage present absent showing otherwise).  Moreover, there is no indication in the record that Tallant's jury was in any way influenced by outside factors.  Therefore, the Court finds that the denial of this claim was not a decision contrary to, or involving an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of facts in light of the evidence presented.[3]

## B.    Juror Bias

Tallant claims that the trial court erred in seating three jurors whose jury questionnaire answers indicated that they could not be impartial because of their admissions to (1) prior employment with child protective services, (2) childhood sexual abuse, and (3) general dissatisfaction with tax monies being allocated to public defenders.

On appeal, the Tennessee Court of Criminal Appeals concluded that the trial court did not abuse its discretion by declining to excuse the three allegedly biased jurors, finding:

> In the instant case, the defendant has not included the jury questionnaires in the appellate record. Thus, our ability to review whether the trial court abused its discretion in seating the three challenged jurors is limited. What evidence that does exist leads us to conclude that the trial court's actions in seating these three jurors did not constitute an abuse of discretion. Berney was no longer employed as a CPS investigator at trial, and during voir dire, the defendant did not ask him specific questions about his previous employment or how it might have affected his ability to serve as an impartial juror. Regarding Mingie, during voir dire the defendant only asked her general questions about her ability to perform her duties in light of the "horrific and painful" testimony that would be presented in this case, to which she responded that she could. The defendant did not ask Mingie whether the fact that he was represented by the district public defender would

---

[3] To the extent this claim is raised solely under State law, the Court notes that claims asserting a perceived violation of State law are not cognizable on federal habeas review absent a determination that the error resulted in the denial of fundamental fairness. *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988).

affect her ability to serve as an impartial juror. Norton was questioned in chambers by the trial judge and defense counsel. When questioned about her past sexual abuse, she replied that she had been abused over a period of seven years by her father, but that she had dealt with the experiences of her past and that being abused would not affect her ability to serve impartially on the jury, even if this case involved sexual abuse allegations. The trial court was satisfied with these answers and allowed her to remain on the jury, as was within the trial court's discretion. In light of this evidence, we conclude that the trial court properly allowed these three jurors to remain on the panel, and we accordingly deny the defendant relief on this issue.

*Tallant I*, 2008 WL 115818, at *18.

A trial judge's determination of impartiality is rebuttable only upon a demonstration of clear and convincing evidence, thus requiring the reviewing court to determine whether the judge's decision was "fairly supported by the record." *Bowling v. Parker*, 344 F.3d 487, 519 (6th Cir. 2003) (citing *Wainwright v. Witt*, 469, U.S. 412, 433 (1985)). The record in this case establishes that the parties were aware of the answers provided on the jury questionnaires, and that the parties were provided an opportunity to question the prospective jurors about their responses. The seated jurors stated that they could render a decision based on the evidence presented at trial [Doc. 27-19 pp. 72-76, 112]. There is nothing in the voir dire responses of the jurors to demonstrate by clear and convincing evidence that the decision to seat the jurors was violative of Tallant's rights. Therefore, the Court finds that the denial of this claim was not a decision contrary to, or involving an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of facts in light of the evidence presented.

## V.    **CLAIM THREE**

Tallant claims that the admission of the medical examiner's testimony regarding injuries apparently unrelated to Lex's cause of death violates his constitutional rights, citing *Old Chief v. United States*, 519 U.S. 172, 174 (1997) (holding that when a federal criminal defendant offers to concede the element of a prior felony conviction for purposes of the federal "felon in possession of a firearm statute," it is an abuse of discretion to reject the offer and admit the full record of the prior judgment), and *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Specifically, Tallant states that the trial court erred when it allowed expert witness, Dr. Mileusnic, to testify regarding all of Lex's injuries, many of which did not meet the statutory definition of "serious bodily injury" [Doc. 19 p. 11].  Tallant insists that allowing testimony on all these injuries, particularly when Sarah offered evidence that Tallant was away from home when at least some of them likely occurred, was overtly prejudicial propensity evidence.

In opposition to Tallant's claim, Respondent alleges that Tallant failed to properly present his constitutional claim in the state courts, as he raised it on direct appeal entirely on the basis of state law.  *See Tallant I*, 2008 WL 115818, at *20.  Therefore, Respondent asserts, Tallant's federal habeas claim is procedurally defaulted.  In reply, Tallant disagrees with Respondent's assessment that his claim is barred but alleges that even if the issue was improperly raised as a constitutional matter, it is defaulted solely because of the ineffective assistance of appellate counsel [*Id.* p. 10].

Claims presented in federal habeas proceedings must be exhausted, which is accomplished when "the federal claim has been fairly presented to the state courts." *See* 28 U.S.C. § 2254(b) & (c); *Picard v. Connor*, 404 U.S. 270, 275 (1971). The Court notes that general appeals to broad constitutional principles in a state court is insufficient to "fairly present" and exhaust a federal claim. *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996) ("We have also indicated that it is not enough to make a general appeal to a constitutional guarantee as broad as due process to present the 'substance' of such a claim to a state court."); *see also Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006) (finding "general allegations of the denial of rights to a fair trial and due process do not fairly present claims that specific constitutional rights were violated") (citation and internal quotation marks omitted). Tallant's only reference to a constitutional issue in raising this claim in state court was a single sentence in his state-court brief referencing his due process and fair trial rights [Doc. 27-31 p. 97]. Therefore, Tallant's general appeal to constitutional principles does not represent a "fair presentation" to the state courts. Inasmuch as a state-court remedy is no longer available to Tallant due to Tennessee's time and successive-petition bars, this claim is procedurally defaulted for purposes of habeas review. *Coleman*, 501 U.S. at 731-32; *see also* Tenn. Code Ann. § 40-30-102(a) (one-year statute of limitations) and Tenn. Code Ann. § 40-30-102 (c) ("one petition" rule).

Even if this claim could be considered on its merits, it does not warrant relief because the admissibility of evidence is a matter of state law and thus not cognizable on federal habeas review unless the ruling results in a denial of fundamental fairness. *Estelle*

*v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (noting evidentiary rulings "cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental") (citation and internal quotation marks omitted).

The appellate court concluded that the trial court did not abuse its discretion in admitting all of the medical examiner's testimony, noting that the evidence of Lex's multiple internal injuries explained the origin of the pneumonia that ultimately caused his death. *Tallant I*, 2008 WL 115818, at *21. Moreover, the evidence of the "multiplicity, distribution, and severity" of the internal injuries illustrated that they could not have been accidental. *Id*. at 22. The court found the evidence was not overly prejudicial because it was not gruesome and contained no direct evidence that the petitioner caused the injuries. *Id.*

The appellate court's determination is supported by the record, and Tallant was not denied his right to a fundamentally fair trial by the admission of the medical examiner's testimony. Accordingly, to the extent that this federal claim is cognizable, the Court finds that the rejection of this claim was not a decision contrary to, or involving an unreasonable

application of, clearly established Supreme Court precedent,[4] nor was it based on an unreasonable determination of facts in light of the evidence presented.

## VI. <u>CLAIM FOUR</u>

Tallant claims that the appellate court erred in finding harmless the trial court's denial of his motion to suppress evidence that he was in possession of methamphetamine on the night of Lex's death [Doc. 19 p. 12]. *See Tallant I*, 2008 WL 115818, at \*25-28. Particularly, Tallant insists that the evidence is relevant only to show that he is a criminal, and that the jury was undoubtedly influenced by the fact that he had drugs on his person, and Lex had traces of the drug in his blood [*Id.*]. He asserts that this conclusion is supported by the questions the jury asked to the medical examiner upon the conclusion of her testimony [*Id.*].[5]

A constitutional error is deemed harmless unless it had a "substantial and injurious effect" on the jury's decision. *Fry v. Piller*, 551 U.S. 112, 121 (2007) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993)). The effect of an error is not determined in isolation; instead, the reviewing court must "ponder[] all that happened" in reaching its decision. *Hendrix v. Palmer*, 893 F.3d 906, 919-20 (6th Cir. 2018). Here, Tallant concedes he voluntarily consented to drug testing prior to his being physically searched, and that the

---

[4] The Sixth Circuit has noted that the Supreme Court has not determined that a state violates due process by permitting propensity evidence in the form of other bad acts evidence, thereby precluding such a ruling from violating "clearly established" law. *See Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

[5] Regarding Tallant's drug use, the jury asked: "Did Mr. Tallant's perspective of Lex Arson's health ever change either under the influence of drugs or not?" and "Could meth have been entered into baby from father breathing into [the] baby[s'] mouth[?]" [Doc. 27-28 pp. 8-9].

results of the voluntary testing revealed methamphetamine in his system [Doc. 27-2 pp. 68-69; Doc. 27-14 pp. 39-40]. Therefore, the fact that he had the drug on his person at the time of the arrest did not have a substantial and injurious effect on the jury's verdict. Accordingly, the decision finding this error harmless beyond a reasonable doubt was not contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of facts in light of the evidence presented.

## VII.  CLAIM FIVE

Tallant argues that his convictions for both felony murder and the underlying felonies of aggravated child abuse and neglect are invalid, as there is no additional proof required to convict him of the underlying felonies that is not required to convict him of felony murder, thereby violating his protection against double jeopardy [Doc. 19 pp. 13-14].

The Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment, provides that no person shall "be subject for the same offense to be twice put in jeopardy for life or limb."  U.S. Const. Amend. V; *Benton v. Maryland*, 395 U.S. 784, 794 (1969) (finding prohibition against double jeopardy in Fifth Amendment "fundamental ideal in our constitutional heritage" that applies "to the States through the Fourteenth Amendment").  Double jeopardy protects (1) a second prosecution after an acquittal, (2) a second prosecution after a conviction, and (3) multiple punishments for the same offense.  *See, e.g.*, *Whalen v. United States*, 445 U.S. 684, 688 (1980).  It is

the third interest that is at issue in this case, thereby requiring the Court to consider whether Tallant is being punished multiple times for the same offense. Whether an offense is the "same," thereby prohibiting multiple punishments, turns on whether the legislature intended to authorize separate punishments for "separate evils." *See Albernaz v. United States*, 450 U.S. 333, 343-44 (1981).

The Supreme Court of Tennessee has addressed the exact issue presented by Tallant and has determined that the legislative intent to allow cumulative punishment in this circumstance is "clear," holding "that aggravated child abuse is not a lesser included offense of felony murder and that dual convictions are permissible[.]" *State v. Godsey*, 60 S. W.3d 759, 778 (Tenn. 2001); *see also State v. Denton*, 938 S.W.2d 373, 379 n.14 (Tenn. 1996) (noting permissibility of cumulative punishment in case of felony murder and the underlying felony because legislative intent is clear). Citing *Godsey*, the Tennessee Court of Criminal Appeals denied Tallant relief on this issue, finding his "convictions for both felony murder and the underlying felonies of aggravated child abuse and neglect did not violate his constitutional protection against double jeopardy." *Tallant I*, 2008 WL 115818, at *28.

Tennessee courts have determined that the legislature intended to punish felony murder and the felony underlying the murder as separate crimes, and the Supreme Court recognizes such legislative intent and distinguishes it from double jeopardy concerns. Accordingly, the decision rejecting this claim was not contrary to, nor did it involve an

unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of facts in light of the evidence presented.

## VIII.  CLAIM SIX

Tallant claims that he received the ineffective assistance of trial counsel when counsel failed (1) to advise him of the importance of testifying in his own defense, (2) to renew the motion for a bill of particulars, and (3) to include the jury questionnaires in the record on direct appeal.  Tallant presented these claims on post-conviction review, and the Tennessee Court of Criminal Appeals rejected them.  *Tallant II*, 2014 WL 3513170, at *18-19.

Claims of ineffective assistance of counsel are governed by the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), which requires a habeas petitioner to satisfy a two-prong test to warrant federal habeas corpus relief: (1) he must demonstrate constitutionally deficient performance, and (2) he must demonstrate actual prejudice as a result of such ineffective assistance.  *Strickland*, 466 U.S. 668 (1984).  Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Id*. at 687-88. This Court's scrutiny is to be highly deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight."  *Id*. at 689.  In fact, counsel is to be afforded

a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Strickland*, 466 U.S. at 689.

Prejudice is established when the petitioner can demonstrate to a reasonable probability that the result of the proceedings would have been different but for the challenged conduct, thereby undermining confidence in the reliability of the outcome. *Strickland*, 466 U.S. at 687, 694. However, an error, even if professionally unreasonable, does not warrant setting aside the judgment if it had no effect on the judgment. *Id.* at 691.

On habeas review, the issue for the district court is not whether the *Strickland* standard is met, but rather, whether the state-court's decision that *Strickland* was not met warrants relief under AEDPA standards. *See Harrington v. Richter*, 562 U.S. 86, 105 (2011) ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, when a *Strickland* claim has been rejected on its merits by a state court, a petitioner "must demonstrate that it was necessarily unreasonable for the [state] Supreme Court" to rule as it did in order to obtain federal habeas relief. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011).

### A.      Tallant's Right to Testify

Tallant claims that trial counsel failed to advise him of the importance of testifying and failed to prepare him to do so, thereby rendering ineffective assistance. He notes that nothing was gained by keeping him off the stand, as he had no prior criminal history and his methamphetamine use had already been presented in the state's case [Doc. 19 p. 16].

The post-conviction court credited trial counsel's testimony that Tallant was advised regarding his right to testify, a finding to which the appellate court deferred. Therefore, this Court must likewise defer to those findings absent evidence that requires it to conclude that the findings were unreasonable. *See, e.g., Marshall v. Lonberger*, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

The record in this case establishes that Tallant was counseled regarding his right to testify in his own defense [Doc. 27-10 pp. 58-60; Doc. 27-11 p. 87]. During the post-conviction evidentiary hearing, trial counsel testified that he had numerous conversations with Tallant regarding whether he should testify [Doc. 27-37 pp. 74-80]. Trial counsel testified that he did not think Tallant's testimony would have been helpful to his defense, but that the decision whether to testify was made by Tallant [*Id.*]. Some of trial counsel's notes of his meetings with Tallant were introduced as exhibits to his testimony, and these notes demonstrate that the possibility of Tallant testifying was discussed, and that Tallant had expressed an intention not to testify [Doc. 27-38 at pp. 84, 89]. Therefore, the record supports the trial court's findings. Accordingly, the decision rejecting this claim was not contrary to, nor did it involve an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of facts in light of the evidence presented.

### B. Motion for Bill of Particulars

Tallant also argues that his trial counsel rendered ineffective assistance in failing to require the trial court to rule on his motion for a bill of particulars or otherwise require the state to elect which injury went to which indicted offense [Doc. 19 p. 17].

Defense counsel filed a pre-trial motion for a bill of particulars seeking to require the state to disclose which injuries to Lex they allege Tallant caused [Doc. 27-2 pp. 26-31, 36-39]. The issue was argued, but not decided, at a pretrial hearing held October 13, 2005 [Doc. 27-5 pp.94-107]. The need for a bill of particulars was referenced by a member of the defense team at a subsequent hearing held on July 20, 2005 [Doc. 27-15 pp. 23-24]. Finally, on January 26, 2006, the trial court again heard arguments about the motion for a bill of particulars and determined that the state was not required to identify each injury inflicted on Lex by Tallant, as the state's position was that Tallant was responsible for all injuries not otherwise explained [*Id*. pp. 29-33]. The trial court stated that a bill of particulars identifying each injury attributed to Tallant would not be required, though the state might be required to elect which injuries are relied upon to form any particular offense before the case went to the jury, depending upon the proof presented at trial [*Id*. pp. 33-34]. The issue was not raised again during Tallant's trial, however, and the trial judge's finding was not reduced to written order.

Defense counsel raised the bill of particulars issue in his motion for a new trial, arguing that because the injuries sustained by the victim were so broad, the absence of a bill of particulars left the defense virtually unable to defend Tallant [Doc. 27-13 p. 144].

In finding the absence of an error with regard to bill of particulars determination, the trial court stated that the state had disclosed all of the injuries sustained by the victim and did not have to inform defense counsel that they were relying on any particular injury to prove aggravated child abuse.  [*Id*. p. 162].

This claim was raised in the context of ineffective assistance of counsel on post-conviction review.  At the evidentiary hearing held on the post-conviction petition, defense counsel stated that the motion or a bill of particulars was argued and denied, and that he believed that the expert trial testimony accomplished what they needed the bill of particulars to establish: the grouping of injuries and when they occurred suggested that Tallant did not inflict injuries that caused the child's death [Doc. 27-37 pp. 93-94].

It is apparent from the record that the trial court denied defense counsel's well-argued motion for a bill of particulars.  Tallant has not presented any evidence that defense counsel was deficient for failing to renew the motion at the close of the state's case, nor has he supplied any evidence to show that the trial court's decision would have been different upon a renewed motion.  Therefore, Tallant's argument of ineffective assistance of counsel is conclusory and fails to state a claim.  *See Workman v. Bell*, 178 F.3d 759, 771 (6th Cir. 1998) (finding where petitioner's allegations were "merely conclusory" they failed to demonstrate counsel was ineffective); *see also Strickland*, 466 U.S. at 687 (holding defendant bears burden of proving both deficiency and prejudice prongs to establish ineffectiveness of counsel).  Inasmuch as Tallant failed to support this claim with any evidence of deficiency or prejudice, the decision rejecting this claim was not contrary

to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of facts in light of the evidence presented.

### C.    Jury Questionnaires

Tallant alleges that trial counsel was ineffective for failing to include the jury questionnaires in the record on direct appeal.

On post-conviction review, the trial court found counsel deficient for failing to include the jury questionnaires on appeal but determined that Tallant had not demonstrated how the deficiency prejudiced his case [Doc. 27-36 pp. 95-97].  On appeal of that decision, the Tennessee Court of Criminal Appeals noted that the independent, substantive claim of juror bias had been thoroughly reviewed and rejected despite the lack of questionnaires, stating:

> [W]e went on to review the issue at some length before concluding that the trial court acted within its discretion in allowing the jurors to remain on the jury. The petitioner has not, therefore, shown that he was denied the effective assistance of counsel based on counsel's failure to include the jury questionnaires in the record on direct appeal.

*Tallant II*, 2014 WL 3513170, at *19 (internal citation omitted).

Inasmuch as the appellate court was able to review Tallant's substantive claim without the jury questionnaires, he has not established any prejudice from trial counsel's failure to include the questionnaires on direct appeal.  Therefore, he cannot demonstrate that the decision rejecting this *Strickland* claim was contrary to, or that it involved an

unreasonable application of, clearly established Supreme Court precedent, or that it was based on an unreasonable determination of facts in light of the evidence presented.

## IX.   CLAIM SEVEN

Tallant claims that he was denied the effective assistance of post-conviction counsel, and that any default resulting from post-conviction counsel's failures to adequately litigate his claims of prosecutorial misconduct should be excused, relying on the exception set forth in *Martinez v. Ryan*, 566 U.S. 1 (2012) [Doc. 1 pp. 16-17; Doc. 19 pp. 18-20].

In *Martinez*, the Supreme Court held that the ineffective assistance of state post-conviction counsel may establish cause to excuse the procedural default of a claim of ineffective assistance of trial counsel, thereby allowing review of the federal claim. *Martinez*, 566 U.S. at 9.  This exception only applies, however, to the first occasion a petitioner has to raise an ineffective assistance of trial counsel claim; it does not apply to claims that post-conviction counsel rendered ineffective assistance in post-conviction appellate proceedings.  *See, e.g.*, *West v. Carpenter*, 790 F.3d 693, 698 (6th Cir. 2015) ("[*Martinez*] does not extend to attorney error at post-conviction *appellate* proceedings because those proceedings are not the 'first occasion' at which an inmate could meaningfully raise an ineffective-assistance-of-trial-counsel claim." (emphasis in the

original)).  Therefore, Tallant cannot argue the ineffectiveness of post-conviction counsel to overcome any defaulted claims.[6]

Additionally, to the extent that Tallant seeks to argue the ineffective assistance of post-conviction counsel as an independent claim, there is no such federal right.  The Supreme Court has held that "[t]here is no constitutional right to an attorney in state post-conviction proceedings."  *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (citations omitted); *Wallace v. Sexton*, 570 F. App'x 443, 454 (6th Cir. 2014) ("The Supreme Court has not recognized ineffective assistance of post-conviction counsel as a free-standing constitutional claim.").  Accordingly, such a claim is not cognizable on federal habeas review.

Finally, the Court finds that Tallant never presented a freestanding claim of ineffective assistance of state post-conviction counsel in State court, and therefore, the claim is also procedurally defaulted.  *See, e.g., Coleman*, 501 U.S. at 731-32.

## X.     <u>CERTIFICATE OF APPEALABILITY</u>

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief.  28 U.S.C. § 2253(c)(1).  A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims

---

[6] The Court notes that Tallant raised claims of prosecutorial misconduct on post-conviction review that were rejected on their merits [Doc. 27-36 pp. 101-02].

debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484 (emphasis added). Applying this standard, the Court concludes that a COA should be denied in this case.

## XI. CONCLUSION

For the reasons set forth above, Blake Tallant has failed to demonstrate an entitlement to federal habeas relief. Therefore, it is hereby **ORDERED** that his petition for a writ of habeas corpus [1] is **DENIED**, and this action is **DISMISSED WITH PREJUDICE**. It is **FURTHER ORDERED** that a certificate of appealability from this decision is **DENIED**. A separate final judgment will issue today.

**IT IS SO ORDERED**.

Further, the Court **CERTIFIES** that any appeal from this action would not be taken in good faith and would be totally frivolous. Accordingly, this Court will **DENY** Petitioner leave to proceed *in forma pauperis* on appeal should Petitioner file a notice of appeal. *See* Rule 24 of the Federal Rules of Appellate Procedure.

**AN APPROPRIATE ORDER WILL ENTER.**

s/ Thomas A. Varlan_____
CHIEF UNITED STATES DISTRICT JUDGE